The case we'll hear this morning is United States v. Murray and Mr. Walker, whenever you're ready, we'll hear from him. Good morning, sir. May it please the Court. I'm Richard Walker. I am one of the Assistant Federal Public Defenders in the Northern District of West Virginia. I represent Richard Johnson. The Court knows the issue in this case is sufficiency of the evidence as to Count 6, which charges possession of two firearms and furtherance of a drug crime that was charged in Count 2. Mr. Johnson was acquitted of Count 2. He was convicted of conspiracy. He was acquitted of Count 2. The heroin charge was dismissed. He pleaded guilty to Count 7. But the focus is Count 6. And our position, very simply, is that there was not sufficient evidence to support that conviction because Mr. Johnson was merely present. And this is a case about two firearms that were, in my opinion, incorrectly attributed by the government to Mr. Johnson because he was in the home. I'm sorry. I just want to make sure I understand. Yes. There wasn't sufficient evidence from which the jury could infer what exactly that he knew about the guns? That he had advanced knowledge of the presence of the firearms. Okay. So it's about advanced knowledge. Under Rosemont. That's the only thing you're contesting. Correct. Okay. This just comes down to whether there's sufficient evidence of Mr. Johnson's knowledge. And in this case, like Blue... And I'm sorry, what he has to know is the guns are there. The guns are there. He has to know the guns are there. And I just, I rely on Blue. Why don't we talk about the evidence? I'm happy to. That's what I know best. I've been living with this case for a long time. Mr. Johnson was merely present. He was basically a squatter because the key facts are no witness saw Mr. Johnson with the firearms. He was not the owner of this residence. He was not on a lease for this residence. You've got a lot of evidence there, but face the hard evidence. Mr. Johnson was a supplier to Mr. Murray of drugs. He lived there for a month in that trailer with Mr. Murray. And the two worked together in the distribution of drug business. But he didn't have dominion. Just a minute. Just a minute. Yes, sir. And when the officers came in, all the drugs are being prepared on the table in the room to the right, which looks like the common room because it has a sofa and the television and other things. And there's a holster on the desk in plain view. And the guns are right there on the shelf in a bag.  And evidence was that when they came to knock, the sheriffs came to knock and they identified themselves. They waited for a minute, maybe more. I watched the tape. It seemed like a long time while there was some scampering. The guy answered the door, but then he didn't open the door for over a minute. And the guns ended up within arm's reach right on the shelf above the drugs. So we have a drug conspiracy, pretty clear drug conspiracy lasting probably for quite a period of time. Mr. Johnson is probably the supplier. They're probably working together. And we have a gun holster lying on the table. And we have the guns in a bag right above the table on the shelf. Right. And you're saying he did not have knowledge of the presence of a gun there. There was no evidence of it. It's so different than the last case. I listened to that case with great interest where, as you described, one theory is all these gentlemen are in a basement with a grinder and they're openly handling firearms and manipulating them. In this case, there's absolutely no evidence of that. Mr. Johnson was in the back of the residence. Mr. Murray was in the front of the residence. The front room, there's no evidence. It is a common area only because people called it a common area. You could look at the tape. You come in the front door and right there to the right is this common room. The only sofa in the unit is there. The only television is there. They each have a computer. There was another television. There was another television. And the drugs are up front on the table. All kinds of drugs paraphernalia. There was another television in the back. And they're in this together and he's been there for a month. That's not how it occurred. That's not what the evidence support. With all due respect, I understand that view of the case. It is not the complete view and, quite frankly, it is not the most accurate view. There was another TV in the back of the room, in the back of the building. And that was where Mr. Johnson's room was. Mr. Murray is over 7 foot. He laid on that couch. That was his room. This was not a typically domesticated home. It was dilapidated. There was no owner. There was no lease. It was a trap house. Let's call it what it was. But Mr. Murray lived in that front room. That's what you could fairly extrapolate from all the evidence. That's where he was located. That's where his backpack was. That's where his sweatpants were. That's where all of his gear was. All of his food was there. These were not close friends. They were not really even roommates. Let's assume Johnson's the supplier. All he does is go to Detroit, come back, drop off the drugs, gives it to Murray. Murray packages it up. He distributes it to all the people he knew because Murray, he's not from West Virginia. He's from Philadelphia. He was our center on the basketball team. He knows everybody. Everybody knows him. He's the one who takes care of the drugs, who packages the drugs, who distributes the drugs. The guns were in that room. I don't think there's evidence that Murray knew the firearms were there. There were people in this residence coming and going. Neither of them seemed to have exclusive dominion and control of the residence because neither was on a lease and neither was an owner. But Johnson especially, with all due respect to Mr. Murray, Johnson especially had no ties, significant ties to this building. So while there are competing views of the case- But can I just stop you on the competing views? Yes. Because I feel like what you just made was a very persuasive argument to a jury and I think a reasonable jury could have adopted it. But there is another way of looking at it. I mean you have to show that no reasonable jury could have adopted one of these two competing views you're laying. Absolutely. And it's a deferential standard and of course I acknowledge that today and I acknowledge it in my brief. But as I say in the brief, and this is not language from the Fourth Circuit, but I think it's been cited by courts, by maybe Moy. There must be some action. Johnson made no action. There must be some conduct. We can presume what his conduct was. I mean the government has this idea, but it's really more of a dream or a theory that he's there at the front table in the front room with Murray, organizing all these- Let me ask you a hypothetical. May I just finish my response to that? Let me just get my question here. Absolutely sir. It's a hypothetical. If the guns are lying, those two guns were actually lying on the table. Could we infer that Johnson, who supplied the drugs, would have brought them to Murray and would have seen the guns on the table? You have to. Because the case law indicates- No, I- Could you infer, you'd agree that's a fair inference? You'd have to determine. Your case law, the precedent in this circuit, would require this court to make a finding of sufficient evidence because plain view cases are different. And that's what we see in the case law. Now we have the circumstance where there is a delay at the door. Obviously, Murray is reacting to this announcement that the sheriffs are at the door. Is that in the record? Yes. That he was obviously- No. No, it's not. He could have also been asleep at four in the morning. No, he answered the door. He came to the door, answered, and then there was a noise. And the question is, there was a holster on the desk in plain view. So we have two guns that we don't know whether were on the table at that moment, but maybe common sense might suggest it to a jury. But we had a holster on the table, and you agreed that Johnson would have seen what was on that table on a regular basis, bringing drugs to Murray in that room. No, I don't agree with that. Because- How does he get the drugs? He could have- We don't know where those drugs were transferred. The drugs don't- They lived together in a conspiracy. Well, they really didn't live together. They were occupying this location. Didn't they live in the same trailer? Mr. Johnson was- Did they live in the same trailer? We'll take a yes or no. No. Mr. Johnson was there. He didn't live there. It wasn't his home. He never used that address as his address. He's a nomadic, at best, in the light most favorable to the government. He's a nomadic drug dealer who had no ties to West Virginia. He had been living in that trailer for a month, in the back room. I think he had been present there. Living there is probably not the term that I would use. Staying overnight, sleeping there. He slept there. He slept there. Your brief calls him an unofficial sub-tenant. Who calls him that? Your brief. I don't remember using that language. I guarantee you, you did when you wrote it down. I think he's- The brief, yes. He's essentially a squatter. He's a guest of someone who didn't have the authority to invite him, Mr. Murray, because Mr. Murray didn't have a lease. He was trying to get a lease. He was trying to establish a lease. I just disagree with the characterization. I don't think it's accurate to say that this was a home where they lived and they interacted. One man lived in the front. One man slept in the back. Murray was intending to establish this as a residence. This is, I think, an important point as it relates to the holster. There's no evidence that Johnson saw the holster, because there's no evidence that Johnson was ever in that front room. There was no evidence that he would need to be in that front room. That was where Murray's stuff was. We know that because, again, if you look at the video, he was our center. When I mean our center, he played basketball for WVU. That's basically our college team, our pro team, all wrapped up in one. He had WVU gear all throughout that front room. The methamphetamine was in, I think, a WVU backpack or in sweatpants that were WVU. I think it was a backpack, a WVU backpack. That's where he kept all his gear. He struggled with a drug problem, and he sat up in that front room. That's where all of his stuff was. If anybody saw the holster, it would have been Mr. Murray. Another thing about the holster, if you look at the video and the pictures, the holster is small and black. The table is black. It's not so easy to see. Let's just assume, again, based on the hypothetical, that Mr. Johnson was in the front room at some point. There's no reason that he would have seen that holster. Again, very different than this case where all these gentlemen were from Cameroon. There's a grinder, and it's loud, and there's an open and notorious activity occurring that if anyone else in that basement would be there, they would hear someone grinding off something, a serial number, something very significant. There's no reason to believe that Mr. Johnson saw that holster. And the government's other argument dealing with what could be considered the difficult evidence is that Mr. Johnson was not in proximity to the firearms. Again, when the police arrived at the residence, Mr. Johnson was in the back of the residence. So there was proximity between the guns and the drugs. There was proximity between the holster and the drugs and the guns, but there was no proximity to Mr. Johnson. So again, because he wasn't an owner, because he wasn't on the lease, because he didn't have a key, because no one saw him with the firearms, because he was not very well established, there may be a month, maybe a month, maybe not the whole time, because he wasn't very well established, and because he didn't exercise dominion and control over that residence, it's different than many cases that have been decided where there had been sufficient evidence. And I think it's a lot like Blue. So I'm out of time. Unless the court has another question, I'll move on. Thank you. Mr. Frame. Good morning, your honors, and may it please the court. I'm David Frame here on behalf of Eric Murray. And I would begin by saying I'm very grateful that you want to talk about the facts, because really, that's really what matters. There's dozens of cases on this point, presumptions that mostly arise out of vehicular cases. A recent one is the Davis case. I don't remember if any of you were on the panel. It's a very obvious case. He's the sole occupant. He's the owner of the vehicle. The butt of the gun is sticking up between the seats, and the inference is pretty clear. But even in that case, the court went out of its way to point out there's no strict liability. These are presumptions, essentially rebuttable presumptions. And so the first point of fact that I want to begin with is that Deputy Ward, who was the lead deputy in this investigation that morning, testified at trial that he could not rule out that those guns were placed there by someone else. Now, why is that? Well, I guess I don't understand how that would be inconsistent in any way with both defendants knowing they were there. They could have been placed there by someone else. They could have been owned by someone else. But at least your colleague was telling me the only question in this case, it's not about who owned them. It's just about did they know they were there. Well, of course, but knowing they're there is just a presumption. There was no direct evidence. There was no, again, several cases in this circuit have quoted the Pardo Sixth Circuit case saying there has to be some word. There has to be some connection, something more than the presumption. Let me tell you what happened. In that room, the guns were found in a green bag. And Judge, forgive me, but I take issue with your comment in arm's reach. Not in arm's reach. Like a lot of vehicular cases, they are literally, proximity means arm's reach. In this case, not in arm's reach, but in the same room. In a bag described as a cloth bag, I think maybe with a zipper enclosure, but described as being closed. The government did not preserve that bag and any evidence it might have about who it belonged to or who put those guns there. And again, the deputy admitted he could not rule out because here's the other evidence you have to consider. You can't just make, allow an inference based on a presumption. The other evidence is that there were numerous people occupying or in and out of the trailer. There was not a stick of furniture in the entire trailer that belonged to Mr. Murray. All the appliances, there was a washer and a dryer, the television, all the chairs and tables. The only thing that was in that trailer that belonged to Mr. Murray actually was probably the clothing that he had on and some other things scattered around. So that's a factor. The fact that the green bag- That's a factor. He's a tenant. He rented it. He was trying to actually sign a lease. He was in the process of going through that situation. How long was he there? A couple of months? I think the evidence was a month or more. More than a month because Johnson was there a month. Okay, okay, right. Yeah, okay. But the point of the other furniture is that other people had access to it too. In fact, I mean, we're not just talking- I don't know if they had access. They came there probably for deliveries. There were personal letters. There was a four-wheeler parked outside that did not belong to either of these defendants, and there was lots of property all throughout the- It was a trap house. Well, it may have been a trap house, but it also was a place where people lived. No, you're laughing, but you don't understand that. That's the whole point. It was a place where people trafficked all the time. And unfortunately, they stay there. They used it. I mean, generally a trap house, right? Therefore, it's not like, well, this is a place where only two people live there or whatever. We can presume everything. I mean, the people were coming and going, and that's why it was such a spartan place probably. Well, I think that diminishes the inference. In one case you have in this circuit, the black case, and so I think you were on the panel actually. It's an old case. I wrote the opinion. Yeah, it's an old case, but in that case- It's not old. It's vintage. It's vintage, right. But in that case, there were only two occupants in the apartment. There was a guy and a girl, and the gun was either his or hers, and she flipped. She testified at trial, I've never seen that gun, and it was in the drawer right beside where he always slept on that couch. In this case, you have multiple people who have apparently been in and out, still have property there. In fact, the manager of the trailer park came and testified that someone named Lisa Johnson had originally leased it for her son who just got out of prison. She didn't know where he was, though. He'd lived there for a while with his girlfriend, and then they were gone. So that diminishes the inference that because my client was an occupant of the building that he knew that the guns were there. Again, you have the green bag which went missing. The gun was tested for fingerprints. Guess what? There was a fingerprint. Not Mr. Murray, though, and not Mr. Johnson. Did the police investigate further who that print belonged to? They didn't. They chose not to. No testing of DNA evidence. The bag is gone, so we can't tell if there's any information there that would suggest to you. So in other words, all the presumptions apply. I don't dispute that, but they're disputable. And when you take the totality, which again, this is why I'm glad you're doing a factual analysis. The totality, there are lots of things that diminish from that inference, and I don't think we quite get there. I mean, it's suspicious. It's evidence upon which the police certainly should say, hey, we better look into this further. But it's not enough, and that's basically our case that if you go to, and again, the language of Pardo, if you don't mind me citing it, quoted in two different cases in our circuit, there must be some action, some word, some conduct that links the individual to the contraband, indicating he had some stake, a power over them. There must be something to prove the individual was not merely an incidental bystander. OK. Thank you. Thank you, Judge. All right. Ms. Wesley. Good morning. May it please the court. I'm Zelda Wesley. I'm here on behalf of the government today. I want to start talking about residency. It is clear, and the jurors made a reasonable reference, inference, that both these defendants resided in that residence. Interestingly, in the body camera with Johnson, at seven minutes and 45 seconds in it, he acknowledges that he had been residing there in that trailer with Mr. Johnson, Mr. Murray, for about a month. Mr. Murray made the same admission in a different body camera, where he said he'd been living there for one to two months, and he actually referred to Mr. Johnson as his roommate. And that occurred in the transport video at 20 minutes and 20 seconds. So both these men are living together in this trailer. What's interesting is the common area, which is when you look at the video, the only real livable space in this trailer. And what's real interesting about that is, is when you consider the evidence that was taken from the flip phone that belonged to Mr. Johnson, which was the Alcatel flip phone, it makes it really clear, and the jurors can draw any reference, that Mr. Johnson was the source of supply, and Mr. Murray was his runner. There are communications where there were like customer service complaints, where people were contacting Mr. Johnson and saying, you know, seven foot, because that's what they called him. He's not meeting me. He was rude when he made the delivery. He tossed dope at me. They were complaining to Mr. Johnson about Mr. Murray's conduct. There were communications where Mr. Murray was saying to Mr. Johnson, you know, I've got the bread, and I'm going to bring it to you. So the flip phone of Mr. Johnson makes it really clear that these two had a drug relationship, and that they were engaged in making distributions, and that is the reason why that drug packaging table in that common area is so important, because we know from the phone that they are packaging drugs, they're making distributions, and that common area is exactly where all of this stuff transpired. On that table, there was Narcan for overdoses. There were syringes. There were needles. There was baking soda. There was crack. There was residue. There was a drug ledger, and there was a notebook which detailed pricing for drugs based upon different quantities that would be sold, all with the holster. It was interesting about the holster is, Deputy Ward, on his video, when he walks in, and before he does the walk around to see if there is a hostage situation, he says to the two officers, I want eyes on both of them, because I see the holster on the table, which refutes any suggestion that that holster wasn't readily visible to anyone who walked in that room. That is immediately on the body camera video from Mr. Ward when he goes into the residence. And it's also important to note that when he's taking Mr. Murray away to the station, and he's having a conversation with him about the things that I think we're going to find in the house, he says, I'm pretty certain I'm going to find a gun in there. And that's based upon seeing that holster on that table in plain view. And that's a reasonable inference because a holster has one point. The only thing a holster can do is basically be used for a firearm. And it is reasonably for those jurors to conclude that the presence of that holster meant that there was a firearm in the residence. And that is the same packaging table where- And are you separating this, as you recount the facts, the two different defendants? That applies to Mr. Johnson too, that he would know that? It applies to Mr. Johnson as well. Why? Mr. Johnson is the source of supply, and that is the packaging table. Any juror can reasonably infer that both men, both men, the one who's bringing the drugs down from Detroit, and the two that are packaging these drugs and selling them, they're doing it at that table. Everything that was needed to cut those drugs, to package them, is right on that packaging table in that common area. And what drugs were on the table? Crack cocaine was on the table, Your Honor. Crack cocaine? Crack cocaine. Anything else? There was some residue, I think it was powder cocaine, is my recollection, that was on that table as well. And of course it was wrapped up the way that they packaged it. They wrapped it up in a notebook. There was residue in the notebook also found on that table. Everything that was necessary to make that business run. There was even a list of what to do if someone has a drug overdose. All of that was contained on that packaging table. So on your theory, I would suppose in terms of the logical extension of your argument, that if Johnson was not present at all when the police officer came in, and the room was just like you described it, if he walked up on the porch, he would be guilty of everything he found, even though he wasn't there at the time. Just because he lives there, right? Because of his phone activity? I'm taking all of those facts. The only thing that's different is that he's not there at all when you come. And later he comes, say 15 minutes later, he would be guilty of all of the things you said. Just the gun and everything. So he's... I mean, right. That's appropriate. Because they could take an inference, make the inference, right? Well, it's a totality question, Your Honor. Here's the other part. So we talked about the Alcatel flip phone. I want to now talk about the Molarola phone. There were two phones that were seized. Both phones belonged to Mr. Johnson. The Molarola phone, there were communications between Mr. Johnson and someone who had a 313 area code, which is Detroit, Michigan. And what he was trying to do was find someone to sit with him while he is making drug distributions. And he offered to pay $3,000 plus food and weed if a person would come down and sit with him for a week or two. The reason that that is important is that is the role that can be reasonably inferred from Seven Foot and Mr. Johnson for two reasons. One, Seven Foot is a big presence. And when the search was executed, seized from Mr. Murray was approximately $6,500 in cash. And seized from Mr. Murray was approximately $2,700. And I may have flipped up numbers, but there was about $9,000 total. But the point of it is that Mr. Murray had more money than Mr.  On the table, there was money too, right? There was money on the table. And the point of Mr. Johnson having less money than Mr. Murray, there's an inference that can be drawn that that's because Mr. Murray ended up with the money for the protection or the to get my back. That's what he was trying to do. And Mr. Johnson is the source of supply. But the person who's the runner had more money than the source. And it would be easy for a jury to infer that he found the person who was going to watch his back and who was going to protect him while he was making his drug distributions. Which would be the reason that the runner had more money than the source. You told the jury this? I'm sorry, what? That was told to the jury, what you just said? I don't recall if I did or not, Your Honor. Sound like you did. I mean, you know, pretty much line in line. I mean, it's like a novella. I mean, you basically weave this thing. Well, I mean, it was. I mean, I guess jurors, why would? I guess that's the kind of evidence you put before them. In that sense. I'm sorry, I didn't mean to interrupt you. No, no, go ahead. He made it clear in the mobile roller phone that he needed someone to protect him. And what the jurors also heard was from two witnesses that helped them understand how this drug enterprise worked. They heard from Mark Trump, who's a DEO task force officer, who explained to the jurors that firearms are important in drug distributions, and that drug dealers are robbed not only by their customers, but they're also robbed by fellow drug dealers, which is the reason why firearms are important. And then they also heard from Deputy Ward on cross examination that wasn't elicited from the government. But he was asked about the accessibility of the firearms. And what Deputy Ward testified to was that firearms are useful in drug enterprises, and that the drug packing station was in close proximity to the guns. And that, and this is as much as a quote as I can recall, that if you were in that drug packaging area, you had ready access to the firearm because it was close to the drug station. And that came out on cross examination by him. Can I ask you just sort of backing off the facts for a  I'm trying to figure out, I'm not sure I've seen a aiding and abetting charge on a 924C possession case before. So I mean, I think what all the defendants are challenging is knowledge. But did you also have to prove that one or the other of these defendants actually owned, possessed the guns? No. So what we had to prove is that the firearm was present and it had the ability to further the drug crime. Yeah. But you didn't have to prove that one of them possessed it? Construct the possession. Okay. So you had to prove, so one of them had to have like control and dominion over it. Okay. But you didn't know which one. Is that why you charged as aiding and abetting? That is correct. And that they had to have the ability to exercise dominion and control. Okay. And one of the things that I think the jurors can infer is that based upon this location to the drug packaging station that those firearms, loaded firearms, were equally available and accessible to both those defendants. Based upon this close proximity to the packaging table and the fact that- How far, there was some challenge. One council said that there was not close to the table. I thought it was. It is, your honor. And so when you look at the body cam video, it makes it clear how small that room is and how close basically everything is in that room. But in addition to that, your honor, in the joint appendix, there are pictures that were taken and pictures number 826, 827, 828, and 829 are various pictures within the room. And joint appendix picture 826 shows the shelf where the bag was where the firearms were contained. Was that a shelf on the same wall which the table was against? Yes, your honor. And in picture 827, it actually shows the packaging table. And you can see in that picture the holster right above the box of gloves in the picture.  I've also seen the tape of the video. Yes. But when you look at that, you can tell that it's a small room and that everything is in close proximity. Deputy Ward testified that it was easily accessible because of its close proximity of the firearms to the drug packaging table. One of the things that I think that it was noteworthy is that when he suggests that, when Mr. Walker suggests that Mr. Johnston was in the back time of the entrance, it ignores the fact that the sole purpose really of this residence is for drug distributions. And the packaging of the drugs that were to be distributed it appears from the video, and the jurors can infer, was exclusively in this drug packaging table, which was self-contained. Everything that was necessary to run their drug business was in that common room at that table. And for those reasons, your honor, we contend that there was sufficient evidence for the jurors to infer that both men had knowledge. The firearms were obviously needed not only to protect themselves, to protect their drug proceeds, and to protect their drugs. There was approximately $3,400 worth of meth that was still in the apartment that day. So in total sum, approximately $12,000 was in that residence. And so if the court has any additional inquiries, I realize I have five minutes left, but if there are no additional questions, I'll cede my time. All right. Thank you, Justice. All right. We'll hear from Mr. Walker. Thank you again. I want to make it very clear, we don't dispute any of the drug evidence. We didn't argue about that much at trial. Drug conspiracy, we admit that. Drugs in the residence, we admit all of that. The government has that ample evidence to support all those convictions. I just want to make the point that no matter the quantum of drug evidence, none of it will ever be a substitute for knowledge, for proof of knowledge of the presence of these firearms. And I think that the government has made a valiant effort to try to sort of conflate those concepts, especially by calling the so-called experts to talk about, well, you just have to have guns if you're going to have drugs. You don't. But that's one of, sorry, I have found this case just a little bit confusing because they did have to prove that not only that your clients knew about the guns, but that your clients knew they were there in furtherance of a drug conspiracy. And the expert testimony, I thought, bore most directly on that. I think the government wanted to, intended to use that for two purposes. I think the government wanted to use that expert testimony to show that the firearms were in furtherance of a drug crime, which, by the way, my client was acquitted of the drug crime that it was allegedly in furtherance of. But also to- He was convicted on some drug offenses, right? He was convicted of a conspiracy, but only count two, which is possession with intention- I know, it's the only one that was cited. Was charged, was the predicate for the 924C charge. My client was acquitted of that charge. But the government, I think the government's intention and their argument in the brief is that, well, you just have to sort of believe that people know that the guns are there because they're drug dealers. And that's an improper argument. There's a fine line between drawing an inference and speculating. And obviously our position in this case is that there is a lot of speculation and that, quite frankly, the jury had to go beyond fair inference and enter the realm of speculation and supposition in order to make this finding as to Mr. Johnson. I think the district court, with all due respect, extrapolated beyond what is reasonable in order to find that Mr. Johnson had knowledge of the firearms. And I think you can see that because there's no direct evidence and I think there's no fair circumstantial evidence, what the government is doing to do its job is sort of trying to identify little hot spots in the case, such as the drug packaging station. Again, we never agreed that it's a drug packaging, that table was a drug packaging station. What was it? It's a desk. It's a desk with Murray's junk on it and a holster and some coins and some cash and some other items. I mean, it's right there in the video. It is also not next to the guns. That's something that's very important. The desk was against a wall. The guns were on another shelf against... On the same wall, right?  No, sir. I would like to respectfully correct that. The guns were on another shelf on another wall. It's a small room. I mean, I don't think that that really makes... Very small room, but... It doesn't make a big difference. This was not an area where everything was organized and set up and where it was clearly an area to package drugs. It could have just as easily been an area where someone used drugs at one point in time. It could have just as much been an area where Murray alone packaged drugs or someone else. I hear you and I know you have to make these arguments, but when you make an argument like that, it almost sounds silly when you have a pad there with prices and instructions and you have cutting agents and you have syringes and you have overdose items and you have packaging and you have thousands of dollars rolled up on the table and a gun holster. I mean, what is this table? And you actually have drugs on the table. This is to call it just a table. I think it had multiple uses and I think Murray, regrettably, has a very serious drug problem. But Murray also lived in that front room, so it was his desk where he put his stuff. It was probably an area where he used drugs. It was probably an area where he used drugs with other people. And it was probably an area where he did package or hold some of the drugs that he would leave. There's evidence of them actually distributing. There are complaints about his distribution methods and they never show up to Johnson about Murray. That phone? The jury never made a finding that the Motorola... They didn't make any findings. They just filed guilt or innocence. They didn't have to find that it was Johnson's. No, I'm suggesting to you that that table was for drug distribution, as the officer told him right as he came in the front door. In part, in part, in part, but not necessarily Johnson. And the flip phone, again, looking for another little... What are the guns doing there? That's the thing. There's no evidence of what the guns are doing. What are the guns doing there? There's no evidence. There's no evidence of what the guns are doing there. What's your speculation? I'm not going to speculate because that's what the government's been doing for four years. The guns were there. We don't know who put them there. We have said the presence of guns close to drugs, you can draw an inference. You can draw an inference that they're used in furtherance of the drug crime. You can't draw an inference because they're present. The case law says that. Mere presence, mere proximity, knowledge, these things cannot be presumed. It's a context. And if you conclude that that was a drug distribution table, they had customers, that they were in a conspiracy to distribute drugs, they had been living there for a month together doing that, that people came there to buy drugs, and then you have two guns there next near the table, and a holster on the table. And there's context in Blue, too, because he's there, and there's a kilo of cocaine there, and there's a gun there, and there's nobody else in the car. But there was never any action, or word, or conduct to suggest that Blue had knowledge of the firearm, and this court, in my opinion, rightly concluded that there was insufficient evidence. Thank you for considering my position. Yeah, it's all right. I know I appreciate that very much. It's not only an argument that I'm making. I think it's an argument that's based on the evidence, and I think it's an argument that's correct. Thank you very much. Yeah. Mr. Frame? Oh, you don't have any left. I didn't. No, I'm not going to just give it to you. You didn't sign up for it. All right. I want to recognize you, Mr. Frame. You were court appointed? Yeah. Well, I want to recognize your service. It's an important service, as I've observed earlier today, and thank you very much for your service to the court. Of course, always the public defender. And I might as well include you as your attorney. Thank you for your argument. We'll come down. We'll adjourn court for the day. Signee die, and come down and read counsel. This honorable court stands adjourned. Signee die. God save the United States and this honorable court. Thank you.
judges: Paul V. Niemeyer, Roger L. Gregory, Pamela A. Harris